UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PHOENIX HERPETOLOGICAL SOCIETY, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES FISH AND WILDLIFE SERVICE, et al., )<br><br>Defendants. ) | Case No. 17-cv-02584 (APM) |

_____

## MEMORANDUM OPINION

### I.      INTRODUCTION

Plaintiff Phoenix Herpetological Society, Inc. ("PHS") brings this action challenging the United States Fish and Wildlife Service's denial of two applications, one to renew its captive-bred wildlife permit insofar as it allowed PHS to keep Grand Cayman blue iguanas, and a second to export four Grand Cayman blue iguanas to the Aalborg Zoo in Denmark.  Plaintiff asserts multiple violations of the Administrative Procedure Act and the Endangered Species Act.  Before the court are the parties' cross-motions for summary judgment.  For the reasons that follow, the court grants Defendants' motion.

### II.     LEGAL BACKGROUND

#### A.      Statutory Background

Congress enacted the Endangered Species Act ("ESA") in 1973 to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and

threatened species." 16 U.S.C. § 1531(b). Section 4 of the ESA directs the Secretary of the Interior or the Secretary of Commerce—depending on the species in question—to promulgate regulations determining, based on a host of different factors, whether species should be considered endangered or threatened. 16 U.S.C. § 1532(6), (15), (20); *id.* § 1533; *see also* 50 C.F.R. § 402.01(b). The Secretary must make this determination based on "the best scientific and commercial data available to him after conducting a review of the status of the species." *Id.* § 1533(b)(1)(A). The ESA defines "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16).

Under Section 9 of the ESA, it is unlawful for anyone "subject to the jurisdiction of the United States" to "take" any endangered species of fish or wildlife "within the United States or the territorial sea of the United States," or "upon the high seas." *Id.* § 1538(a)(1). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Id.* § 1532(19). Section 9 also prohibits a person from (1) possessing, selling, delivering, carrying, transporting, or shipping any species that was illegally taken, *id.* § 1538(a)(1)(D); (2) "deliver[ing], receiv[ing], carry[ing], transport[ing], or ship[ping] in interstate or foreign commerce" any endangered species, *id.* § 1538(a)(1)(E); or (3) selling or offering for sale in interstate or foreign commerce any endangered species, *id.* § 1538(a)(1)(F). Notwithstanding these restrictions, under Section 10 of the ESA, the Secretary may issue permits that allow acts otherwise prohibited by Section 9 "for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A); *see also* 50 C.F.R. § 17.22.

### B.        Permitting Regulations

In 1979, pursuant to its Section 10 authority, the United States Fish and Wildlife Service ("FWS") established the Captive-Bred Wildlife ("CBW") permitting program.  That program allows qualified individuals to "take; export or re-import; deliver, receive, carry, transport or ship in interstate or foreign commerce, in the course of a commercial activity; or sell or offer for sale in interstate or foreign commerce any endangered wildlife that is bred in captivity in the United States" if "[t]he purpose of such activity is to enhance the propagation or survival of the affected species."  44 Fed. Reg. 54,002, 54,007 (Sept. 17, 1979) (codified at 50 C.F.R. § 17.21(g)(1)); *see also Am. Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros.*, 502 F. Supp. 2d 103, 111 (D.D.C. 2007).  A CBW registration requires a finding that such registration "will not operate to the disadvantage of the species."  50 C.F.R. § 17.21(g)(3)(ii).  "Where [an] applicant has not provided information to find that the parental stock of a species proposed to be covered by a CBW registration has been imported into the United States legally," and FWS "does not have information available to it that the parental stock of such species has been imported into the United States legally," the agency "does not have a basis for mak[ing] the required findings under 50 CFR 17.21(g)."  Administrative Record, ECF No. 45-1 [hereinafter AR], at 92[1] (citing 50 C.F.R. 17.21(g)); *see also id.* at 252 (explaining that in order to qualify for a CBW permit, FWS "must be able to determine that the purpose will not operate to the disadvantage of the species . . . . Part of that review includes a determination that all stock being bred or traded under the authorization were obtained legally, including that all founder stock were imported into the United States in accordance with U.S. laws and treaties governing the protection of the requested species.").  If an applicant for a CBW registration receives a written notice of denial, it may request reconsideration.

---

[1] For ease of reference, all citations to the Administrative Record are to the PDF-generated page number, not the record pagination found in the lower right corner of each page.

*Id.* § 13.29(a).  The applicant must request reconsideration before it may seek judicial review. *See Conservation Force v. Salazar*, 919 F. Supp. 2d 85, 89–90 (D.D.C. 2013).

A separate but related process exists to obtain an export permit under the ESA. An applicant must show, among other things, the direct and indirect benefit that issuing the permit would have on the wild populations of the species, and whether the permit would "be likely to reduce the threat of extinction facing the species of wildlife sought to be covered."  50 C.F.R. § 17.22(a)(2)(ii), (iv).  In addition, Section 9 of the ESA incorporates portions of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), an international treaty that prohibits the import, export, trade, and possession of CITES-listed species when those actions are "contrary to the provisions of" CITES.  16 U.S.C. § 1538(c).  Under CITES, "Appendix I" species are considered the "most endangered."  *The CITES Appendices*, CONVENTION ON INTERNATIONAL TRADE IN ENDANGERED SPECIES OF WILD FAUNA AND FLORA, https://www.cites.org/eng/app/index.php (last visited Apr. 30, 2020).

To obtain an export permit for Appendix I species, the Director of FWS's Division of Management Authority must make two findings.  First, he must find that the specimens were legally acquired.  50 C.F.R. § 23.36(c)(1).  "Legal acquisition" means that the specimen and its parental stock were obtained in accordance with "local, State, Federal, tribal, and foreign laws." *Id.* § 23.60(b)(1).  To establish that a particular specimen of a non-native species was legally acquired, an applicant may be required to submit sufficient evidence that the parental or "founder" stock of the specimen was either legally imported into the United States or present in the country prior to the enactment of CITES.  *See id.* § 23.45 (outlining the requirements for pre-Convention specimen); *id.* § 23.36(c)(1) (requiring "legal acqui[sition]" under CITES for the issuance of an export permit), *id.* § 23.60(e) (providing that, for the export of captive-bred wildlife, whether the

parental stock was legally acquired may be considered).  Individual endangered specimens that were "held in captivity or in a controlled environment" before the ESA went into effect will also be exempt from certain permitting requirements under the Act.  *Id.* § 17.4(a).  Second, a separate office within FWS, the Division of Scientific Authority, must find that the proposed export would not be detrimental to the survival of the species, known as a "non-detriment" finding.  50 C.F.R. § 23.36(c)(2); *see also id.* § 23.61.

### III.    FACTUAL BACKGROUND

Plaintiff Phoenix Herpetological Society ("PHS") is an Arizona-based corporation "dedicated to propagation and conservation of endangered . . . rare, and . . . nearly extinct reptiles." Am. Compl., ECF No. 34 [hereinafter Am. Compl.], ¶ 12.  Plaintiff holds a Captive-Bred Wildlife Registration Permit, issued to it by FWS.  *Id.*  Plaintiff's CBW permit was originally issued in 2010.  Pl.'s Mot. for Summ. J., ECF No. 21 [hereinafter Pl.'s Mot.], Apx. #2, ECF No. 21-1 [hereinafter Apx. #2], at PDF p. 4.  Over the next seven years, Plaintiff renewed and amended its CBW permit multiple times, adding additional species.  *Id.*, Apx. #4, ECF No. 21-1, at PDF pp. 8–26.  One of the species listed on Plaintiff's original CBW permit is *Cyclura lewisi*, or the Grand Cayman Blue Iguana ("blue iguana").  *See* Apx. #2 at PDF p. 4.  The blue iguana is listed as an endangered species under the ESA, *see* 48 Fed. Reg. 28,460, 28,461–62 (June 22, 1983); *see also* 50 C.F.R. § 17.11(h), and as an Appendix I, or "most endangered," species under CITES.[2]  Blue iguanas are endemic to the Grand Cayman Islands.  48 Fed. Reg. at 28,462.

---

[2] The list of CITES species is available at the searchable database: http://checklist.cites.org/#/en (last visited Apr. 30, 2020).  Searching "Cyclura lewisi" shows that the species was first listed as an Appendix II species in 1977 and then reclassified as an Appendix I species on June 6, 1981.  See also *The CITES Appendices*, CONVENTION ON INTERNATIONAL TRADE IN ENDANGERED SPECIES OF WILD FAUNA AND FLORA, https://www.cites.org/eng/app/index.php (last visited Apr. 30, 2020).

In 2016, Plaintiff submitted two applications to FWS related to the blue iguana.  The first, submitted in March, sought to export four iguanas to the Aalborg Zoo in Aalborg, Denmark for the purpose of establishing a breeding and conservation program.  AR at 257–80.  The second, submitted in June, sought to renew Plaintiff's CBW registration, which included the blue iguanas kept at its facility.  *Id.* at 6.  FWS denied the export application outright, *id.* at 291–93, and denied the CBW renewal application in part by discontinuing authorization to keep blue iguanas, *id.* at 10–12.  Plaintiff filed a reconsideration request, *id.* at 20–90, and an appeal, *id.* at 99–228, but both were unsuccessful, *id.* at 92–97, 252–53, 301–03, 313–16.  The court discusses each application in greater detail below.

## A.   Export Application

FWS, through its Division of Management Authority, originally denied Plaintiff's export application.  FWS first explained that "since the specimens identified in the application are all related and no other specimens of this species are held at the Aalborg Zoo, breeding these animals would not provide any conservation benefit."  *Id.* at 292.  In addition, because blue iguanas are an Appendix I-listed species under CITES, to obtain an export permit, Plaintiff had to show that "the proposed export would not be detrimental to the survival of the species" and that "the specimens to be exported were legally acquired."  *Id.*  Based on the information before it, FWS found that Plaintiff had failed to satisfy either criterion.  The agency "was unable to find that the export would be for purposes that would not detrimental to species in the wild," and it lacked "documentation showing legal acquisition for the founder stock."  *Id.*

On reconsideration, Plaintiff submitted additional information concerning the parental stock of the four blue iguanas.  It explained that one pair originated from Ty Park in Ocala, Florida, and that the second purportedly were carried to the United States from the Cayman Islands in 1971

by Ramon Noegel.  *Id.* at 298.  Additionally, Plaintiff challenged the finding that inbreeding would be detrimental to the survival of the species.  FWS again denied the export permit.  *Id.* at 301–303. The agency again found that "no information was provided to support the founder stock were legally imported."  *Id.* at 303.  Moreover, although FWS did determine that the export of the Noegel pair was not detrimental to the survival of the species, *see id.* at 299, it was "unable to find that the [Ty Park] pair met the same criteria," *id.* at 303; *see also id.* at 299.  Ultimately, the agency concluded that, "due to questions about the legal acquisition of the two pairs and their founder stock, this office continues to be unable to authorize your request for the exportation of four Grand Cayman blue iguanas to Aalborg Zoo."  *Id.* at 303.  That decision was upheld on appeal.  *See id.* at 313–16.

### B.    CBW Application Renewal

FWS denied the Plaintiff's CBW application renewal for reasons similar to its denial of the export permit.  The Chief of the Branch of Permits within the Division of Management Authority found that questions arose regarding "the legality of the [blue iguana] parental stock and how they were originally imported into the United States."  AR at 11.  He acknowledged the agency had previously authorized Plaintiff to keep blue iguanas but explained that the agency was now "questioning the validity of those approvals based on the lack of information on the parental stock's origin."  *Id.*  Accordingly, until the agency could "confirm the legal origin of the species, [it] . . . [would] need to re-evaluate previous approvals," and "cannot renew approval for" the blue iguana.  *Id.*

On reconsideration, FWS upheld the denial, reasoning that "because we have not been provided with evidence of the legal acquisition of your specimens back to the original importation of founder stock, we are unable to confirm whether specimens imported into the United States or

any progeny resulting from those imported specimens has been legally acquired." AR at 93. On appeal, the denial was affirmed. The Deputy Director of FWS explained, "I considered the information included in your CBW renewal application, including the fact that [the Division of Management Authority] had previously authorized your request to register the blue iguana," and "given the lack of sufficient information pertaining to legal acquisition of all founder stock, I agree with [the] decision to remove the authorization for this species from your existing CBW until such time that legal origin of the founder stock can be documented." AR at 252–53.

### C.     Procedural History

On December 4, 2017, two individual plaintiffs, Christian Ryder and Russell Johnson, filed suit against Defendants FWS, then FWS director Daniel Ashe, and then Secretary of the U.S. Department of the Interior Ryan Zinke challenging both permit denials. *See generally* Compl., ECF No. 1.[3] Ryder is a member of PHS and its Chief Legal Officer. *Id.* ¶ 12. Johnson is also a member of PHS. *Id.* ¶ 13. They brought three claims alleging violations of the Administrative Procedure Act ("APA") and the ESA. *See id.* ¶¶ 42–46.[4]

In early 2019, the parties filed cross-motions for summary judgment. *See* Pls.' Mot.; Defs.' Combined Opp'n to Pl.'s Mot. for Summ. J. & Cross-Mot. for Summ. J., ECF No. 26 [hereinafter Defs.' Mot.]. In April of that year, the court granted Plaintiffs' Unopposed Motion to Substitute

---

[3] Ashe and Zinke have been substituted for their successors—Aurelia Skipwith and David Bernhardt respectively—pursuant to Federal Rule of Civil Procedure 25(d). Fed. R. Civ. P. 25(d).

[4] Ryder and Johnson's original Complaint included allegations regarding FWS's failure to include the *Crocodylus palustris*, or mugger crocodile, and the *Gavialis gangeticus*, or gavial, within Plaintiff's CBW registration renewal. *See* Compl., ECF No. 1. The parties, however, later requested "dismissal of the portions of Plaintiffs' three claims that pertain to the exclusion of *Crocodylus palustris* and *Gavialis gangeticus* from previous captive bred wildlife registration permits." Joint Stipulation of Dismissal of Pls.' Claim Relating to the Captive Bred Wildlife registration for *Crocodylus palustris* and *Gavialis gangeticus*, ECF No. 27. After the parties noticed the partial dismissal, Ryder and Johnson filed an Amended Complaint for the purpose of naming PHS as the real party in interest; the amended pleading, however, also reasserted allegations regarding *Crocodylus palustris* and *Gavialis gangeticus*. Order 4/22/2019, ECF No. 33; Am. Compl., ECF No. 34, at ¶¶ 2, 18. The court does not understand the Amended Complaint to reinstate the previously dismissed claims, so it addresses here only the claims as they pertain to the blue iguanas. If the court has misinterpreted this procedural sequencing, Plaintiff should so notify the court.

Phoenix Herpetological Society, Inc. as the named plaintiff.  *See* 4/22/2019 Order, ECF No. 33.

On April 22, 2019, Plaintiff filed an Amended Complaint for the purpose of substituting PHS for

Ryder and Johnson.  Am. Compl., ECF No. 34.[5]  Thereafter, the parties completed their summary

judgment briefing.

## IV.    LEGAL STANDARD

The APA provides that a reviewing court shall "hold unlawful and set aside agency action"

if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A).  The "'arbitrary and capricious' standard of review is a highly deferential

one" and "presumes the agency's action to be valid."  *Envtl. Def. Fund v. Costle*, 657 F.2d 275,

283 (D.C. Cir. 1981) (citations omitted).  The court must consider whether the agency's decision

"was based on a consideration of the relevant factors and whether there has been a clear error of

judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  The

agency's explanation for its decision "must include a rational connection between the facts found

and the choice made."  *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986) (cleaned up) (quoting

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

When reviewing a final agency action under the APA, "the district judge sits as an appellate

tribunal and the entire case on review is a question of law."  *Philip Morris USA Inc. v. U.S. Food

and Drug Admin.*, 202 F. Supp. 3d 31, 45 (D.D.C. 2016) (cleaned up) (quoting *Am. Bioscience,

Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  "[T]he court's review is limited to the

administrative record."  *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995) (citing

*Camp v. Pitts*, 411 U.S. 138, 142 (1973)).  And its role is limited to "determining whether or not

---

[5] The substitution of PHS for Ryder and Johnson resolved any question as to whether any plaintiff had standing to bring this action.  *See Parker v. District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007) (observing that the D.C. Circuit "consistently [has] treated a license or permit denial pursuant to a state or federal administrative scheme as an Article III injury").

as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Philip Morris*, 202 F. Supp. 3d at 45 (cleaned up). "The court's concern is not whether the [agency] might have reached a different decision" if it had considered additional evidence, but only whether the decision it did reach, based on the evidence before it, was unreasonable. *Doe v. Rogers*, 139 F. Supp. 3d 120, 133 (D.D.C. 2015) (internal quotation marks omitted) (quoting *Conax Fla. Corp. v. United States*, 824 F.2d 1124, 1128 (D.C. Cir. 1987)). The scope of review is narrow, and the court should not "substitute its judgment for that of the agency." *Id.* (citation omitted). The agency's decision need only be "reasonable and reasonably explained." *Nw. Corp. v. FERC*, 884 F.3d 1176, 1179 (D.C. Cir. 2018).

The agency must, however, "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Rogers*, 139 F. Supp. 3d at 133 (quoting *State Farm*, 463 U.S. at 43). Further, the agency's factfinding must be supported by "substantial evidence" or "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 149 (quoting *Consolidated Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

## VI.   ANALYSIS

Plaintiff's complaint and briefing are, to say the least, challenging to follow. Plaintiff's opening brief, for example, contains nearly 30 pages of factual and historical background interwoven with some legal assertions, and then only eight pages formally labelled as its legal argument. Plaintiff asserts that "FWS's denials, detriment findings, and negative enhancement findings all represent a clear error of judgment as they were not based on the relevant factors and choices were made with no rational connection to the facts," and "that relevant factors were not

considered because Defendants['] finding and permit denials did not conform to the evidence presented to them." Pl.'s Mot. at 33. The court understands Plaintiff to advance the following two primary contentions. First, the agency's explanation runs counter to the evidence. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997–98 (D.C. Cir. 2008) ("[A]n agency acts arbitrarily or capriciously if it . . . 'offered an explanation for its decision that runs counter to the evidence before the agency.'" (quoting *State Farm*, 463 U.S. at 43)). Second, the agency failed to consider an important aspect of the problem by not considering "the best science and facts available to it"— specifically, evidence demonstrating the legal acquisition of the blue iguanas. *Id.; see also* Pl.'s Br. in Opp'n to Defs.' Mot. & in Reply to Defs.' Opp'n to Pl.'s Mot. for Summ. J., ECF No. 40 [hereinafter Pl.'s Reply], at 8.

Plaintiff also offers four more contentions as to why the application denials were arbitrary and capricious. First, the agency "did not follow its own mandate" and "ignored its own directive," Pl.'s Mot. at 34–35, because, according to its policy and action plan, the mission of FWS permitting "is to promote long-term conservation of animals, plants, and their habitats and encourage joint stewardship with others," *id.* at 35 (citing Leaving a Lasting Legacy: Permits as a Conservation Tool, U.S. FISH & WILDLIFE SERV. (November 2002)).[6] Second, Plaintiff argues that Defendants "violated a bundle of duties" under the ESA, "particularly the most fundamental duties to recover and not jeopardize listed species." *Id.* Third, Defendants violated "their duties under the ESA to implement CITES . . . by not accepting Denmark's non-detrimental finding." *Id.* at 39–40. Finally, the agency violated the APA when it failed to release a 2017 Memorandum from the FWS Division of Scientific Authority to Plaintiff. *Id.* at 39.

For their part, Defendants counter that they reasonably denied Plaintiff's export permit

---

[6] Available at: https://www.fws.gov/permits/legacyfs.pdf.

because "PHS failed to establish legal acquisition under CITES or show that the export would
enhance the survival and propagation of the blue iguana under the ESA." Defs.' Mot. at 20–22.
Similarly, "PHS failed to establish that the CBW renewal would enhance the propagation or
survival of the blue iguana under the ESA," or that the registration would "not operate to the
disadvantage of the species," so the CBW permit denial was similarly reasonable. *Id.* at 23–24.
Defendants also contest Plaintiff's remaining four arguments.

Ultimately, the court finds that the agency's decision to deny both permits was "reasonable
and reasonably explained," *Nw. Corp.*, 884 F.3d at 1179, and that the agency did not fail to
consider evidence that would have proven the legal acquisition of the blue iguana specimens.
Plaintiff's various other contentions similarly fail. The court addresses each of Plaintiff's
arguments in turn.

### A.    Substantial Evidence Supports the Agency's Decisions

#### 1.    CBW Renewal Application

A court should "uphold a[n] [agency] decision of less than ideal clarity if the agency's path
may be reasonably discerned." *State Farm*, 463 U.S. at 43 (citation omitted). FWS easily satisfies
that standard here. With respect to Plaintiff's CBW application, FWS found that "during [its]
review of [Plaintiff's] request to renew [its] CBW registration and the subsequent review of a
separate application for [Plaintiff's] facility to export Grand Cayman blue iguanas . . . , questions
regarding the legality of the parental/founder stock arose." AR at 93. It went on to say that
"[w]here the applicant has not provided information to find that the parental stock of a species
proposed to be covered by a CBW registration has been imported into the United States legally,"
and where the agency "does not have information available to it that the parental stock of such
species has been imported in the United States legally," the agency does not have a basis for

making the required findings under 50 C.F.R. § 17.21(g)—that the registration would not operate to the disadvantage of the species. *Id.* And because, in this case, the agency was not "provided with evidence of the legal acquisition of [Plaintiff's] specimens back to the original importation of founder stock," the agency could not "confirm whether specimens imported into the United States or any progeny resulting from those imported specimens" were legally acquired. *Id.* On appeal, FWS explained that it had considered the information included in Plaintiff's CBW renewal application, "including the fact that [the agency] had previously authorized [Plaintiff's] request to register the blue iguana," but that "given the lack of sufficient information pertaining to legal acquisition of all founder stock," the blue iguana would be removed from Plaintiff's registration "until such time that legal origin of the founder stock can be documented." AR at 252–53.

The agency's decision letters, and the administrative record as a whole, indicate careful consideration of Plaintiff's application regarding Plaintiff's acquisition of its blue iguana pairs. FWS made its decisional path easily discernable, and it "examine[d] the relevant data," "articulate[d] a satisfactory explanation . . . including a rational connection between the facts found and the choice made," and made decisions supported by "substantial evidence." *See Rogers*, 139 F. Supp. 3d at 133, 149. The agency's exclusion of blue iguanas from Plaintiff's CBW permit renewal therefore was not arbitrary and capricious.

### 2. Export Permit

The same is true of FWS's denial of the export permit. The agency initially found that, because the blue iguana specimens to be exported were all related and the Aalborg Zoo did not have any other blue iguanas, the export and breeding of the iguanas "would not provide any conservation benefit to the species" because the breeding of the iguanas would not "ensure adequate genetic diversity," and the information provided "was insufficient or irrelevant in

showing how the proposed activity would enhance the propagation or survival of the species in the wild." AR at 292.  Similarly, the agency could not find that the proposed activity would not be detrimental to the survival of the species, or that the specimens to be exported had been legally acquired.  *Id.* (citing 50 C.F.R. §§ 23.36(c)(1), (2)).  Before reaching this decision, the agency "requested information on the founder stock" and reviewed the submitted response but found that "no documentation was provided on the acquisition of the parental stock, nor was a permit number given for the import . . . and [the agency was] unable to verify the issuance of an import permit . . . in [its] records."  *Id.*

The agency's position changed slightly on reconsideration: its original non-detriment finding stated that the agency did not have sufficient information on the origin of any of the four iguanas and therefore it could not find that the export of the iguanas would not be detrimental to the survival of the species.  *Id.* at 285.  But with its reconsideration request, Plaintiff "presented new information that portrayed an alternative narrative regarding the origin of the two parental stocks than was previously presented."  *Id.* at 315.  The "information indicated that one pair was a direct result of breeding from stock obtained from the breeder in Florida who had, according to the applicant, obtained their stock prior to the enactment of the ESA or CITES."  *Id.*  Accordingly, FWS "evaluated the additional information provided in the reconsideration request and was able to find that the export of the pair bred from pre-Act and pre-Convention parental stock obtained from the breeder in Florida would not be detrimental to the survival of the species, thus revising the[] original finding to approve two of the four specimens."  *Id.*; *see also id.* at 301–03.  That finding did not, however, "include a finding that the[] specimens were legally acquired."  *Id.* at 315.  The agency also reiterated that "since the original four specimens are closely related, it does not appear that breeding between these specimens would be consistent with maintaining genetic

diversity for the species." *Id.* at 316.  Accordingly, the denial was upheld on reconsideration and appeal. *Id.* at 301–03, 315–16.

As this recitation demonstrates, the agency carefully considered Plaintiff's export application, including the new evidence submitted on reconsideration.  Again, the agency's decision-making path could "be reasonably discerned," *State Farm*, 463 U.S. at 43, and the court cannot conclude that its decision was arbitrary and capricious.

**B.      Additional Evidence of Sound Agency Decision-making**

There is another important indicator that the agency made a reasonable decision based on the evidence before it: the agency went beyond the application materials provided to it and sought out additional information on the origin of the blue iguana specimens at issue—something that, at least under CITES, the agency was not required to do.  *See* 50 C.F.R. § 23.60(c)(1) ("The applicant must provide sufficient information for [the agency] to make a legal acquisition finding." (internal citation omitted)).

After receiving Plaintiff's applications, FWS reached out to the Cayman Islands government regarding the blue iguanas.  AR at 230–37; 239–44; 246–50; 308–11.  The administrative record includes multiple detailed emails showing an attempt by the agency to better understand the origin of the iguana specimens and whether they were legally acquired.  *See id.* The emails also indicate serious consideration of the information received.  For example, in one email about Cayman Islands law and the date of exportation of the original iguanas, an FWS Division of Management Authority employee expresses her opinion that the information received "is way too broad for us to make an informed decision given the information we have to date," and that "conflicting statements" about the historical export of iguanas from the Cayman Islands were "problematic."  *Id.* at 310–11.  "[W]ithout having as close a date as possible to the actual exports,"

FWS would not be able to "determine if a permit by [FWS] would have been required." *Id.* at 311. Such diligence supports the conclusion that the agency's decision was "reasonable and reasonably explained," *Nw. Corp.*, 884 F.3d at 1179, and the court declines to substitute its judgment for that of the agency, *Rogers*, 139 F. Supp. 3d at 133.

### C.     The Agency Did Not Fail to Consider Evidence of Legal Acquisition

Notwithstanding the agency's clear diligence, Plaintiff contends the FWS failed to consider evidence that conclusively establishes the legal acquisition of the blue iguanas. Pl.'s Mot. at 16–17; Pl.'s Reply at 8–13. Specifically, Plaintiff cites to a declaration from David Blair, as well as five "proofs" in the form of websites, articles, and exhibits referenced in its reply brief. None of this evidence renders the agency's application denials arbitrary and capricious.

#### 1.     David Blair Affidavit

Attached to its reconsideration request, Plaintiff submitted an affidavit from David Blair, an "iguana breeder and blue Cayman expert." AR at 85; Pl.'s Mot. at iv. Plaintiff argues that the affidavit "indisputably established" that the specimens for export originated from founder stock derived from "Pre-Convention specimens," "the iguanas were pure-bred," and the pair of iguanas acquired by Blair "were not siblings, and the founding stock had entered the United States legally." Pl.'s Mot. at 16. The affidavit states that Blair was "given at no fee" two blue iguanas, which were "propagated from different clutches deriving from" iguanas "obtained in 1971 from Ramon Noegel in Florida." AR at 85. The affidavit further details that Noegel advised Blair "with complete certainty" that the iguanas "were captured as wild-caught on Grand Cayman Island" and that Noegel hand carried the iguanas back to the U.S. in checked bags. *Id.* Blair states that the iguanas captured by Noegel had "successfully propagated about 15 times" since he received them. *Id.*

The agency's rejection of the Blair Affidavit as sufficient to establish legality of the parental stock was not arbitrary and capricious.  For starters, as Defendants note, the Blair Affidavit "provides uncorroborated hearsay about how the species arrived in the United States."  Defs.' Mot. at 21.  The agency was within its discretion to reject such weak evidence.  Additionally, the record shows that the agency followed up on the affidavit's representations.  FWS "conducted its own research into the origins of blue iguanas in the United States from Cayman Islands' representatives and found that there was inconclusive evidence that blue iguanas in the United States, including those to be exported by PHS were derived from legally acquired founder stock."  *Id.*  As discussed, the record contains a number of emails between FWS and officials in the Grand Cayman Islands, attempting to pin down the exact origins of the iguanas.  AR at 230–37; 239–44; 246–50; 308–11. Those emails resulted in conflicting information, including "written accounts [that] called into question whether Mr. Noegel . . . actually imported iguanas in 1971."  Defs.' Mot. at 13 (citing AR 230–37).  Having considered all of the evidence at its disposal, the agency reasonably determined that it could not approve either application.

Plaintiff also argues that the agency "did not . . . and cannot now, present a scintilla of evidence Noegel's import violated any law of any jurisdiction."  Pl.'s Mot. at 18.  But it is not the agency's burden to prove that no laws were violated.  Rather, the permit applicant must provide sufficient information in its application to allow the agency to make a finding of legal acquisition. *See* 50 C.F.R. § 17.21(g).  Plaintiff failed to carry its burden.  The agency therefore did not act arbitrarily and capriciously.[7]

---

[7] Plaintiff also notes that it identified statements from a Grand Cayman government employee, Frederick Burton, as well as five articles and scientific studies, and argues that the agency did not sufficiently consider those materials, which it alleges "plainly confirm inbreeding occurs in iguanids in nature."  Pl.'s Mot. at 19–20.  But even as described by Plaintiff, this information dealt with inbreeding of the specimens proposed for export and the question of sufficient genetic diversity.  It did not provide evidence of legal acquisition.  Thus, this material, even if favorable to Plaintiff, would not have resulted in the granting of the permits.  *See* 50 C.F.R. § 23.36(c)(1), (2) (requiring both a finding of legal acquisition and a non-detriment finding for an export permit).

2.    *"Proofs" Not Before Agency*

Plaintiff also argues that the agency did not consider five other "proofs" when it denied its applications.  PHS, however, makes that argument for the first time in its reply brief.  *See* Pl.'s Reply at 9–11.  For that reason alone, the court rejects it.  *See United States v. Van Smith*, 530 F.3d 967, 973 (D.C. Cir. 2008) (noting that the D.C. Circuit has "repeatedly held that an argument first made in a reply brief ordinarily comes too late for [the court's] consideration").

Even if the court were to consider the argument, it is fatally defective for another reason: none of this evidence was before the agency at the time it considered the permit applications. *See generally* AR.  Plaintiff's five numbered "proofs" include a "Reptile Longevity Index," websites and articles, and exhibits attached to the reply brief.  Pl.'s Reply at 9–11.  After the close of summary judgment briefing, the court asked Plaintiff to make "a supplemental filing identifying where in the administrative record" Plaintiff submitted to the agency the evidence cited in its reply brief.  Minute Order 5/8/2020.  Plaintiff's response offered no citation to the administrative record or any other evidence to suggest that any of the five "proofs" were ever in front of the agency. *See generally* Decl. of Frederick Coles, III, ECF No. 46.  The court is left to conclude that such evidence was not at the agency's disposal when it considered Plaintiff's CBW renewal application and export application.  The court therefore does not consider the "proofs" in assessing whether the agency's denials were arbitrary and capricious.  *See Babbitt*, 903 F. Supp. at 105 (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)) ("[T]he court's review is limited to the administrative record.")).

**D.    Other Alleged Violations of the ESA and CITES**

Having rejected Plaintiff's primary contentions, the court turns to Plaintiff's secondary assertions that FWS "did not follow its own mandate," violated the "spirit and purpose" of the

ESA, as well as a "bundle of duties" under the ESA.  Pl.'s Mot. at 35–39.  None of these claims is persuasive.

Plaintiff first argues that the ESA "includes a congressional mandate to federal agencies, including the statement that '[i]t is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in **furtherance** of the purpose of this chapter.'"  Pl.'s Mot. at 37 (alteration in original) (citing 16 U.S.C. § 1531(c)(1); *Humane Soc'y of the U.S. v. Kempthorne*, 481 F. Supp. 2d 53, 67–68 (D.D.C. 2006)).  However, the cited portion of the ESA is a "non-operative statement of policy" and does not impose "an enforceable mandate for some additional procedural step."  *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 987 (9th Cir. 2015) (internal quotation marks and citation omitted).  Such declarations of purpose and policy "do not create substantive or enforceable rights."  *Id.* (citing *Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 175 (2009)).  Defendants therefore did not violate any statutory duty set forth in Section 1531(c)(1).

Second, Plaintiff contends that "[t]he ESA imposes on Defendants a fundamental duty to cooperate with well-managed conservation programs of foreign nations.  For example, Defendants must encourage foreign countries to provide for the conservation of wildlife," "take into account foreign nations' effort to protect threatened and endangered species," and "give notice to and seek the comment of foreign nations whose species may be affected by a change in FWS regulation, or where their species are to be located."  Pl.'s Mot. at 37–38 (citing 16 U.S.C. § 1537(b); *id.* § 1533(b)(1)(A); *id.* § 1533(b)(5)(B)).  Such duties are, according to Plaintiff, "reinforced by the requirement that Defendants must take into account the views and opinions of scientists, organizations, or others 'having expertise concerning the wildlife or other matters germane to the

19

application.'" *Id.* at 38 (citing 50 C.F.R. § 17.22(a)(2)).  FWS officials violated such duties, says Plaintiff, when they "chose to ignore their Danish colleagues" and failed to consider "the corresponding inbound CITES authorization document [that] Plaintiff sent to FWS nearly one[ ] year prior to the final adverse determination." *Id.*  This argument fails, too.  No provision of the ESA requires FWS to defer or give controlling weight to the views of an importing country.  At most, the agency's regulations provide that FWS "shall consider . . . [t]he opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application," among several other relevant factors.   50 C.F.R. § 17.22(a)(2)(v).  Plaintiff, however, offers no citation to the record or any other reason to believe that the agency ignored the views of Danish colleagues.  In any event, so far as the court can tell, the Danish determination is not even in the record.  Plaintiff attaches the Aalborg Zoo In-Bound CITES Certificate to their motion, Pl.'s Mot, Apx. #10, ECF No. 21-1, at PDF p. 50, and cites to a document in the administrative record labelled "[Export] AR 64," see Pl.'s Mot. at 38, but that reference is to an internal agency memorandum that does not make mention of any advice from Dutch regulators, *see* AR 313–17.

Plaintiff also argues that "Defendants have failed to follow CITES Resolution Conference 2.11 by not accepting Denmark's non-detriment finding when Danish Wildlife authorities issued the CITES inbound certificate." Pl.'s Mot. at 39.  Plaintiff first cites to Article III of CITES, which requires a non-detriment finding from a Scientific Authority of both the exporting and importing countries.  CITES Art. III §§ 2–3.[8]  Plaintiff then quotes from CITES Resolution Conference 2.11, claiming that "[t]he importing country should 'accept the finding . . . of the exporting country that the exportation . . . is not detrimental to the survival of the species." Pl.'s Mot. at 40 (citing CITES

---

[8] Available at: https://www.cites.org/eng/disc/text.php#III.

Res. Conf. 2.11(b)-(c)[9])).  But CITES Resolution Conference 2.11 is inapplicable on its face.  That Resolution pertains to the "need of uniform interpretation of the Convention *with regard to hunting trophies*."  CITES Res. Conf. 2.11 (emphasis added).  Hunting trophies are not at issue here. Plaintiff thus points to no provision of CITES or any subsequent resolution that would have required the FWS to accept Denmark's non-detriment finding.

### F.    March 2017 Division of Scientific Authority Memorandum

Finally, the court addresses Plaintiff's argument that FWS was required to have released to Plaintiff a 2017 Memorandum from the FWS Division of Scientific Authority, AR at 297–99, as well as other unspecified documents, *see* Pl.'s Mot. at 39.  Plaintiff says that "Defendants are required to keep records and make them available to the public before the public can be expected to be bound by Defendants' rules and policies," and cites generally to sections 551–557 of the APA.  *Id.*  But Plaintiff has not asserted a claim under the Freedom of Information Act.  Nor does it identify any request for information that it made or what information FWS is required to make publicly available absent a specific request.  Plaintiff's barebones argument does not allow the court to conclude that FWS violated any sort of disclosure requirement.

## VII.    CONCLUSION

For the foregoing reasons, the court grants Defendants' motion for summary judgment, ECF No. 26, and enters judgment in favor of Defendants.  A separate, final order accompanies this Memorandum Opinion.

Dated:  June 5, 2020

Amit P. Mehta
United States District Judge

---

[9] Available at: https://cites.org/eng/res/02/02-11.php.